IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CECIL EDWARDS, JR.                                                                    PLAINTIFF

      v.                         4:10-cv-02042-BSM/JTR

KARL BYRD,                                                                           DEFENDANTS
Sheriff, Faulkner County, et al.

## AMENDED COMPLAINT

Comes now the Plaintiff, Cecil Edwards, Jr. (Edwards) by and through his attorney, the Morris W. Thompson Law Firm, P.A., and for his complaint against the Defendants, Faulkner County, Karl Byrd (Byrd), Captain John Randall (Randall), Major Bobby Brown (Brown), Lt. FNU Lasker (Lasker), Lt. Troy Porter, (Porter), Sgt. FNU Fawkles (Fawkles), Cpl. FNU Hall (Hall), detention officers FNU Padgett (Padgett), FNU Thomas (Thomas), FNU Medalin (Medalin) (sp?), FNU Winter (Winter) and two unknown Arkansas State Police Troopers, herein identified and sued as John Doe Defendants and states and alleges as follows:

### INTRODUCTION

1.      This is an action brought under 42 U.S.C. § 1983; Ark. Const. Art. 2 § 2, Ark. Const. Art. 2 § 6, Ark. Const. Art. 2 § 9, and the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123-101 et seq. Edwards seeks redress against Faulkner County for its policies, procedures, customs and usages which were a proximate cause of the Plaintiff's injuries. In addition thereto he seeks redress against the named officers jointly and severally in their individual capacities for their actions which were excessive and deliberately indifferent to

Edward's constitutional rights to be free from excessive force and cruel and unusual punishment, protected by the U.S. and Arkansas Constitutions as well as federal and state laws aforementioned.

2. Pursuant to 28 U.S.C. §§ 2201 and 2202, Edwards seeks declaratory and injunctive relief and request that the court declare the rights and legal relations of the parties and thereby hold and enjoin the policies, procedures, customs, practices and usages of the Sheriff's Department and the County Jail which violated his rights.

3. Additionally, pursuant to its plenary power under 28 U.S.C. § 1367, Edwards seeks redress under the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123-101 et seq. and for the state torts sounding in negligence.

## JURISDICTION AND VENUE

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Section 1343(a)(3), the jurisdictional provision of 42 U.S.C. § 1983; original jurisdiction pursuant to 28 U.S.C. § 1331, federal question jurisdiction; and 28 U.S.C. §§ 220 and 2202, declaratory and injunctive relief. Additionally, pursuant to 28 U.S.C. § 1367, this court has supplemental jurisdiction to hear and decide the pendant state tort claims under the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123-101 et seq. and negligence.

5. All parties were residents of Faulkner County at all relevant time periods and all acts complained of occurred within the corporate limits of Faulkner County.  Consequently venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

6. Edwards is a citizen of the United States, and currently a resident of Jefferson County,

Arkansas, and City of Pine Bluff, Arkansas. At the time period relevant to this cause of action he was a resident of Faulkner County, Arkansas. Edwards, as are most of the other detainees beaten, kicked and otherwise subjected to the unreasonable actions by the defendants, is a black male.

7. At all time relevant, Byrd was the legally constituted Sheriff of Faulkner County, Arkansas and functioned in that capacity at all times relevant hereto. Furthermore, as Sheriff, Byrd was at all relevant times in question the chief decision and policy maker for the County Jail.

8. Upon information and belief, at all times pertinent, Randall was the Chief Deputy over the penal or lockup aspect of the County Jail.

9. Upon information and belief, at all times pertinent, Brown was a Major, supervisor, at the Jail.

10. Upon information and belief, at all times pertinent, Lasker was a Lieutenant, supervisor, at the Jail.

11. Upon information and belief, at all times pertinent, Porter was a Lieutenant, a supervisor within the Jail.

12. Upon information and belief, at all times pertinent, Hall was a corporal, a supervisor within the Jail.

13. Upon information and belief, at all times pertinent, Fawkles was a Sergeant, a deputy Sheriff whose primary assignment was patrol.

14. Upon information and belief, at all times pertinent Medalin is a detention officer within the Jail.

15. Upon information and belief, at all times pertinent, Padgett is a deputy sheriff whose primary assignment is patrol duty.

16. Upon information and belief, at all times pertinent, Winter was the on duty medical personnel at the Jail at all pertinent times.

17. Upon information and belief, at all times pertinent, the two Arkansas State Police officers, John and Jane Doe, pursuant to policy and standard procedure, were summoned by Byrd and/or Randall to assist them in their unconstitutional actions.

18. Upon information and belief, the Jane Doe state trooper's last name is Dycus.

## FACTS

19. On or about October, 24, 2010, Edwards was a pretrial detainee held at the Faulkner County Detention Center (FCDC) pending hearing on a parole revocation.

20. Several weeks prior to October, 24, 2010, in a coordinated effort, a few of detainees or inmates had begun a series of disturbances throughout the FCDC.

21. The floors at the FCDC are constructed such that the rooms in which the inmates and detainees sleep (the pods) are located within a larger area referred to as cells. Each cell contained several pods, typically designated A through C. Overlooking each cell and the pods therein is a guard tower that looks down into each cell and pod as well. The guard within the tower, among other things, electronically controls the opening and closing of each pod door.

22. Beginning on the second floor, first one cell after another, a few days apart, one or two detainees or inmates would set off the sprinklers within the cell, stick wet paper to the window of the cell door, and beat and kick on the cell door yelling and shouting creating a disturbance.

23. Upon information and belief, their intent was to aggravate and irritate the FCDC staff in order to hasten transfer to the Arkansas Department of Corrections (ADC) to begin

4

serving their sentence.

24. Upon information and belief, by the 24th of October, at least three cells on the second floor and one on the third floor had staged such a disturbance.

25. Upon information and belief, Byrd and Randall were frustrated with the ongoing disturbances and decided to bring back piece and order to the FCDC by an extreme show of force that would discourage other inmates from continuing such conduct.

26. On the date in question, upon information and belief, Byrd and Randall decided to use extreme force to make an example for the rest of the jail of the inmates in cell 309.

27. Byrd and Randall instructed the co-defendants to employ a "shock and awe" type show of force. Furthermore, they instructed their co-defendants to use whatever force they chose to convince and persuade the inmates to cease these disturbances.

28. On October 24, 2010, two or three white male inmates in cell 309 where Edwards was housed began a similar disturbance. They masked their face, stuck wet paper over the window of the cell door and placed a mattress against the slot in the door, colloquially called the "bean hole".

29. The inmates then plugged up the toilets and sinks in their pods flooding the floor of the cell. The began beating and kicking on the entry door to the cell, yelling at the top of their lungs. Because of the construction of the jail, the concrete walls, floors and ceiling along with the metal doors etc, the noise reverberated throughout the floor and seemed to magnify as it bounced off of the walls.

30. Before the disturbance began, Edwards and several other inmates were in their pod, pod B, with the door open, sitting on their bunks talking and socializing. Other inmates and

detainees were also in their pods. Several inmates were out in the day area sitting at the picnic table playing cards and watching tv.

31. All the while, the guards in the tower overlooking the cell could see what was going on throughout the cell and the pods and see who was creating the disturbance.

32. When the disturbance started, Hall responded by trying to mace the inmates holding the blanket through the bean hole. However, the inmates held the mattress tight against the opening and for a few minutes was able to prevent Hall from doing so.

33. After a point, Hall was able to spray mace into the cell and the inmates causing the disturbance ran into their respective pods, pods A and C.

34. With the exception of the water still flooding the cell and pod floors, the disturbance had been quelled.

35. Approximately 35 to 40 minutes later, the defendants came back dressed in full riot gear and appeared at the entrance door of cell.

33. The inmates could see them approach and everyone out in the day area and the pods dropped spread eagle to the floor in a submissive pose and did not resist.

37. Despite the fact, that the disturbance had been over for at least 30 minutes or more, and everyone was showing surrender and no resistance, Brown threw a flash grenade into the day room and the defendants entered in force.

38. The defendants first went to pod A, grabbed the submitting inmates by their arms and legs, handcuffed them and drug them across the flooded cell floor into the day area.

39. When the water first began to spread from pods A and C, Edwards and the others in his pod, inmates Darrell Manning (Manning), Cleveland Smith (Smith), Allen Merrick

6

(Merrick), Akemla Burton (Burton) and Kelcey Perry (Perry), had placed their blankets at the pod door to prevent water from entering their pod.

40. However, one of the inmates causing the disturbance shut heir door unexpectedly as he ran by wedging the blanket into the door track. When the defendants came to Edward's pod, they could not open the door.

41. Despite the fact the tower guard had seen the entire occurrence and knew that Edwards and the other in pod B had not been involved; and, despite the fact that inmate Danny O'Neal (O'Neal), who had been in the day area, and others were yelling that Edwards and the others in pod B had nothing to do with the disturbance, the defendants began demanding they "unlock" the door and submit.

42. The defendants were looking into pod B through the window and could see that Edwards and the others were submitting and spread eagle on the floor. Despite this, they became more and more angry that they could not get the door open.

43. Manning explained through the door that they were on the floor and were not resisting nor interfering with the door. Manning requested that if the guards not shoot, he would get up and unwedge the door.

44. Once Manning pulled the blanket from the door, he immediately dropped back to the floor spread eagle and submitted. Once the door opened, the defendants entered with unreasonable and excessive force. Fawkles threw a flash grenade into the pod on top of Edwards. The grenade hit Edwards on the head and rolled against his outstretched arms as he lay on the floor. It exploded within inches of his head and arm burning him on his face and arms from the flash of the grenade. Within the concrete and steel confines of the pod and laying in such close

proximity to his head, Edwards was deafened by the explosion.

45. Inmate Kelcey Perry was lying prostrate on his bunk as there was no room on the floor. One of the guards, upon information and belief, Captain Randall, kicked him in the head and told him to get on the floor.

46. Upon information and belief, Porter and Lasker were carrying 12 gauge shotguns loaded with bean bag munitions. They followed the explosion into the pod and at close range, standing above the passive inmates opened fire, repeatedly shoot the inmates as they lay prostrate on the floor.

47. Because there was no room on the floor, when Perry rolled from his bunk, he rolled partially under his bunk. Porter and Lasker shot him no less than three (3) times in the back and buttocks at close range

48. Merrick was shot in the buttocks as he lay prostrate on the floor.

49. Burton was kicked in the head and shot in the back as he lay prostrate on the concrete floor.

50. The defendants then handcuffed Edwards and the others and drug them by their arms and legs out of their pod into the filthy water that had accumulated in the day area and forcing them to lay face down on the concrete floor.

51. As a result of the unreasonable force the Plaintiff received painful burns to his arm and face in addition to painful injury to his ears from the explosion at such close range.

52. All of the inmates in pod B were African-American. No other inmate in any other cell or in the day room was subjected to the harsh treatment as were they. Only the African-American inmates within pod B were subjected to the explosion of a flash grenade thrown on top

of them within their cell or shot with the bean bag shot gun as they were.

53.     The John Doe State Troopers, John and Jane Doe, also participated by grabbing the inmates once handcuffed and dragging them through the filthy water into the day area.

54.     Following the above recited incidents and action of the defendants, Edwards was denied adequate medical care for his wounds and ear injury. Despite Byrd's, Randall and Winter's knowledge of his serious medical conditions, they failed and refused to provide him adequate and timely medical care and treatment.

FEDERAL CIVIL RIGHTS VIOLATIONS UNDER 42 USC § 1983

55.     Edwards adopts by reference the allegations contained in paragraphs 17 through 54 above.

56.     The above recited acts and omissions of Defendants, while each was acting under color of authority and in their individual and official capacities, respectively constitute a deprivation of Edwards' constitutional entitlement to be free from cruel and unusual punishment, and excessive force as guaranteed by the 4th, 8th, and 14th Amendments to the United States Constitution.  Such acts of Defendants while acting within the color of their authority are sufficient to invoke an action under 42 U.S.C. § 1983 against them for which Edwards seeks damages as set forth herein above.

57.     Byrd, Randall, and Winter, despite being aware of Edward's serious medical conditions, in deliberate indifference, took no action to see to it that Edwards received adequate medical treatment timely or at all. Their actions were in deliberate indifference to Edwards' serious medical needs.

58.     The actions of the separate defendants, Randall, Brown, Lasker, Porter, Fawkles,

Hall, Padgett, Thomas, Medalin were the result of Byrd's decisions and practices as Sheriff which were tantamount to official policies.

59. Furthermore, these actions were the results of Byrd's failure in hiring, to train, and supervise said defendants. Said rampant failures in hiring, retention, instruction and training, control and/or supervise said officers are the results of Byrd's decisions as the chief policy and decision maker for the FCDC as well as the long standing usages, customs, practices and policies of the Detention Center.

60. Edwards' right to be free from cruel and unusual punishment was well established at that time such that any reasonable law enforcement would be aware of the standard.

61. Edward' right to adequate medical care for his serious medical conditions was well established at the time such that a reasonable officer would be aware of the standard.

62. These decisions were in derogation of Edwards' rights and privileges protected by the 4th, 8th and 14th amendments to the U.S. Constitution, federal and state laws, Ark. Const. Art. 2 § 2, Ark. Const. Art. 2 § 6, Ark. Const. Art. 2 § 9, and the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123-101 et seq.

63. Neither defendant is entitled to qualified immunity for their actions.

64. The County, as a municipality, is not entitled to qualified immunity and is separately liable for the FCDC's policies, usages, customs, practices and/or Byrd's decisions as the final decision and policy maker for the FCDC have the force and effect of law.

## PENDENT STATE TORT CLAIMS

65. Edwards adopts by reference the allegations contained in paragraphs 17 through 53.

66. The aforesaid acts constitute violations of Ark. Const. Art. 2 § 2, Ark.Const. Art. 2 § 6, Ark.Const. Art. 2 § 9, and the Arkansas Civil Rights Act (ACRA), codified at A.C.A. § 16-123-101 et seq.

67. The foregoing actions by the defendants also establish the common law tort of civil assault and battery.

## DAMAGES

68. As a natural and foreseeable result of said acts of Defendants, Edwards suffered extreme pain and suffer and severe emotional distress. For these acts, Edwards seeks damages as set forth below.

69. For the acts, omissions, customs and policies complained of herein, Edwards seeks the following relief:

   a. Compensatory and punitive damages for violation of his constitutional rights;

   b. Compensatory and punitive damages for violations of the ACRA;

   c. Damages for pain and suffering;

   d. Compensatory damages for permanent hearing loss;

   e. Compensatory damages for loss of earning capacity;

   f. Damages for emotional distress;

   g. Reasonable Attorney's fees and costs;

   h. All other damages to which Edwards is entitled under both § 1983 and state common law.

70. Plaintiff reserves the right to plead further as subsequently discovered evidence warrants.

WHEREFORE, Cecil Edwards requests a judgment against Defendants, jointly and severally, for violation of his rights protected by the United States and Arkansas Constitutions; 42 U.S.C. § 1983; Ark. Const. Art. 2 § 2; Ark. Const. Art. 2 § 6; Ark. Const. Art. 2 § 9; the ACRA and the common law claim for assault and battery. Furthermore, Edwards seeks judgment for compensatory damages for the violations of said rights as well as the pain and suffering and mental anguish; for punitive damages; for reasonable attorney's fees and costs; and for all other just and proper relief in the premises.

PLAINTIFF DEMANDS A JURY TRIAL

        Respectfully Submitted for
        Cecil Edwards, Jr., Plaintiff herein

        *Morris W. Thompson*

Morris W. Thompson, ABN#80145

Morris W. Thompson Law Firm, P.A.
P.O. Box 662
Little Rock, AR 72203
(501)661-8100
Fax: 372-4101
E-mail:mwthompsonlaw@sbcglobal.net